FILED

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

04 JUL 13 PM 4:46

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| DOTTIE HARVELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 04-PT-1036-M |
| | ) | |
| | ) | |
| WYETH, a corporation; et al | ) | |
| | ) | |
| Defendants. | ) | |

ENTERED

JUL 13 2004

## MEMORANDUM OPINION

This cause comes on to be heard upon plaintiffs Dottie Harvell's ("Harvell") and Beverly

Scarbrough's ("Scarbrough") Motion to Remand and Motion for Sanctions, filed on June 7, 2004,

and defendant Wyeth's Motion to Stay to Allow Transfer to the Multi-District Litigation Proceeding,

filed on May 20, 2004.

## FACTS[1] AND PROCEDURAL HISTORY

Plaintiffs Harvell and Scarbrough[2] are citizens and residents of Marshall County, Alabama.[3]

Defendant Wyeth is a corporation organized and existing under the laws of Delaware with its

---

[1] The court has reviewed plaintiffs' complaint in its entirety but does not restate here the complaint's allegations regarding the history of the Fen-Phen litigation, alleged publications regarding the dangers of the drugs at issue, etc..

[2] It appears that plaintiffs Harvell and Scarbrough were also plaintiffs in another case against Wyeth that appears to have been transferred to MDL. *See Campbell, et al v. Wyeth*, 4:03cv3364 (Order dated March 24, 2004). The non-diverse defendant in *Campbell, et al* was the sales representative.

[3] The court notes that both the complaint and the briefs in this case fluctuate in referring to plaintiff in the singular or plaintiffs in the plural. Since the case heading involves two plaintiffs (Harvell and Scarbrough) and the parties have not differentiated them for purposes of the allegations, the court must assume that all allegations in the complaint apply to both Ms. Harvell and Ms. Scarbrough.

principal place of business in New Jersey.[4]  Wyeth does business in the state of Alabama.  At all

relevant times, plaintiff alleges, Wyeth "was in the business of promoting, marketing, manufacturing

and distributing the pharmaceuticals Pondimin (fenfluramine) and Redux (dexfenfluramine) in

Alabama."  According to the complaint, defendant Michael Belyeu, M.D., ("Dr. Belyeu") a resident

of Alabama, "was the physician for plaintiffs, Dottie Harvell and Beverly Scarbrough, and prescribed

the drugs in question to Plaintiff, Jacqueline Dinkins."  *See* Compl. ¶ 4.[5]

On April 15, 2004, plaintiffs filed a complaint in the Circuit Court of Marshall County,

Alabama, against defendants Wyeth and Dr. Belyeu.[6]  In the complaint, plaintiffs alleged that they

suffered from a variety of health problems (including heart and pulmonary injuries) as a result of

ingesting Pondimin and/or Redux.    The complaint contained the following claims against

defendants: Count I (Alabama Extended Manufacturer's Liability Doctrine); Count II (Failure to

Warn); Count III (Breach of Warranty of Merchantability); Count IV (Negligence); Count V

(Wantonness); Count VI (Fraud, Misrepresentation, and Suppression); Count VII (Physician Conduct

- Medical Negligence); and Count VII (Fictitious Parties).[7]

A number of places in the complaint reference Dr. Belyeu.  First, as noted earlier, plaintiffs

allege that Dr. Belyeu is a licensed physician in Alabama who "was the physician for plaintiffs,

Dottie Harvell and Beverly Scarbrough, and prescribed the drugs in question to Plaintiff, Jacqueline

---

[4] Wyeth is the successor corporation to American Home Products Corporation, Wyeth-Ayerst Laboratories Division of American Home Products Corporation, and A.H. Robbins Company, Inc.

[5] It is unclear to the court who Ms. Dinkins is, as she is not listed on the docket sheet as a plaintiff.

[6] The complaint was also filed against various fictitious parties.

[7] The court assumes plaintiffs meant to label this final count "Count VIII."

2

Dinkins." Later, the complaint states: "Dr. Belyeu relied on Defendant Wyeth's representations regarding the safety and effectiveness of Pondimin and/or Redux in dispensing these drugs to patients for weight loss, including the Plaintiff."[8] Furthermore, Count VII entitled Physician Conduct - Medical Negligence states that Dr. Belyeu: (1) knew or should have known that the drugs in question (which he prescribed) were unreasonably dangerous and/or would cause injury to the Plaintiff; (2) "failed to adequately and properly warn the Plaintiffs about the possible side effects and dangers associated with taking the drugs in question, including, but not limited to, PPH, PH, pulmonary system damage, heart-valve damage and/or death" ; and (3) "failed to advise and/or recommend the Plaintiffs undergo a cardiovascular exam, echocardiogram, and/or any other medical examination after the drugs were removed from the consumer market, or test which could have prevented and/or minimized the injuries complained of herein." Furthermore, Count VII alleges, plaintiffs reasonably relied on Dr. Belyeu's skill and judgment to provide reasonable prudent medical care including the determination of whether Pondimin and/or Redux were medically safe and appropriate given her history and physical condition as well as failed to advise her as to the dangers of the prescribed drugs and the need to undergo preventative exams to identify injuries caused by the diet drugs in a reasonable and timely fashion. Plaintiffs allege that Dr. Belyeu "failed to exercise the ordinary care and diligence exercised by other physicians in the same or similar circumstances," thus failing to act as a reasonably prudent physician or meet the community's appropraite medical standards. According to the complaint, despite a multitude of medical literature and studies following the removal of Pondimin and Redux from the market, and literature that suggested that the damage to the pulmonary system and heart valve caused by Pondimin and/or Redux is

---

[8] The court assumes plaintiffs meant to write "plaintiffs" here.

progressive in nature and that the symptoms associated with it sometimes do not show up until several years after taking the drugs,[9] Dr. Belyeu never alerted plaintiffs to the possible dangers of the drugs or advised them to have an echocardiogram, cardiovascular examination, and/or diagnostic testing.

In the complaint, plaintiffs also assert the application of the discovery rule, contending that the suit was instituted within two years of plaintiffs first being conclusively diagnosed with legal injury and/or damage.  Alternatively, plaintiffs argue, the statute of limitations and/or statute of repose is equitably tolled as to Dr. Belyeu as a result of his fraudulent concealment of the diet drugs' dangers and/or his failure to alert plaintiffs about the need to be medically evaluated.  Plaintiffs aver that the *Brown v. American Home Products* Nationwide Class Action Settlement Agreement accomplished such equitable tolling.  Plaintiffs further invoke the doctrine of equitable estoppel based on Dr. Belyeu's alleged misrepresentation and/or concealment.

On May 19, 2004, Wyeth filed a notice of removal pursuant to 28 U.S.C. § 1332, alleging complete diversity.  Wyeth's Notice of Removal contended that the non-diverse defendant - Dr. Belyeu - was fraudulently joined due to (1) no reasonable possibility of recovery against Dr. Belyeu because of the applicable statute of limitations and statute of repose and (2) plaintiffs' failure to state a sufficient claim against Dr. Belyeu under the Alabama Medical Liability Act ("AMLA").

## STANDARD FOR MOTION TO REMAND

Federal courts are courts of limited jurisdiction.  *See Russell Corp. v. American Home Assurance Co.*, 264 F.3d 1040, 1050 (11th Cir. 2001).  Therefore, federal courts have power to hear only those cases that they have been authorized to hear by the Constitution or by Congress.  *See*

---

[9] This latency allegation is disputed, *see infra.*

4

*Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). The limited nature of federal court jurisdiction has caused the Eleventh Circuit to favor remand of removed cases where federal jurisdiction is not absolutely clear. *Russell Corp.*, 264 F.3d at 1050. The removal statute is to be construed narrowly with doubt construed against removal. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 107-09 (1941).

A case may be removed to federal court only if the case could have been brought originally in federal court pursuant to diversity of party citizenship or federal question jurisdiction. *See* 28 U.S.C. § 1441(a). However, removal cannot be based on diversity if any properly joined defendants are citizens of the state in which the suit was originally filed. *See* 28 U.S.C. § 1441(b). The determination of whether federal jurisdiction exists must be made on the face of the plaintiff's well-pleaded complaint. *Pacheco De Perez v. AT & T Co.*, 139 F.3d 1368, 1373 (11th Cir. 1998). An anticipated or even inevitable federal defense generally will not support removal. *Id.* at 1373 (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392-93 (1987)). The burden of establishing federal jurisdiction is placed on the defendant, with all doubts resolved in favor of remand, *Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11th Cir. 1996). When multiple defendants are involved, all defendants must consent to removal. *Russell Corp.*, 264 F.3d at 1050.

## ARGUMENTS

## MOTION TO REMAND AND FOR SANCTIONS

I.      **Plaintiffs' Motion**[10]

      A.      Introduction

---

[10] Plaintiffs provide a brief history of the Fen-Phen litigation which this court will not repeat. Suffice it to say that plaintiffs claim that Wyeth knew of increased risk of PH, PPH, and VHD prior to the September 15, 1997 withdrawal of Pondimin and Redux from the market.

According to plaintiffs, their suit against Dr. Belyeu (who allegedly prescribed the diet drugs to them) is based upon his fraudulent, negligent, and/or wanton marketing, promotion, prescribing, selling, and/or otherwise distributing Pondimin and/or Redux to them.

Plaintiffs deem Wyeth's multiple removal positions in similar cases to be "fraudulent removal" designed to create an unfair, unnecessary delay in the plaintiffs' prosecution of their cases. Plaintiffs further deem Wyeth's actions to be inappropriate forum shopping. Plaintiffs request Rule 11 sanctions against defendant Wyeth. According to plaintiffs, filing a pleading for purposes of unnecessary delay is clearly prohibited by Rule 11 of the Federal Rules of Civil Procedure. Plaintiffs also cite *Sumlin v. American Home Products Corp., et al*, (CV3:03-1020-BN)(S.D. Miss. March 19, 2004)[11](granting motion for remand and sanctioning Wyeth for improper removal of a diet drug lawsuit).[12] *See also  Ident Corp. of America v. Wendt*, 638 F. Supp. 116, 118 (E.D. Mo. 1986). Likewise, plaintiffs argue, Rule 11 prohibits filing a pleading for the purpose of transferring a case to delay a potentially adverse ruling in the present court. *See Pathe Computer Control Sys. Corp. v. Kinmont Indus.*, 955 F.2d 94 (1st Cir. 1992). The case law, plaintiffs argue, supports their claims against both Dr. Belyeu and Wyeth.

**B.    Arguments and Authorities**

**1.    Jurisdiction**

Removal statutes are to be construed strictly in favor of remand, with any doubts being interpreted against removal. *See Univ. of S. Ala. v. Amer. Tobacco Co.*, 168 F.3d 405, 411 (11th Cir.

---

[11] This unpublished opinion is attached as Pl. Ex. A.

[12] An examination of *Sumlin*, this court notes, indicates that the court concluded that defendants' notice of removal was not filed in a timely fashion and that defendants' "other paper" argument was meritless.

6

1999).

    a.    **Wyeth's Removal is Defective Because Not all Defendants Joined in the Removal.**

Wyeth's removal, plaintiffs contend, violates the "rule of unanimity." According to plaintiffs, Dr. Belyeu was served with a copy of the complaint but did not formally join Wyeth's Removal Notice, which fails to properly effectuate removal. *See Retirement Sys. of Ala. v. Merrill Lynch & Co.*, 2002 WL 1160169 (M. D. Ala. 2002); *see also Harris v. Edward Hyman Co.*, 664 F.2d 943, 944 n. 3 (5th Cir. 1981); *Miles v. Kilgore*, 928 F. Supp. 1071, 1076 (N.D. Ala. 1996)("Because the filing requirements contained in 28 U.S.C. section 1446(a) are mandatory, there is no federal jurisdiction when one of the defendants fails to join in, file his own, or officially and unambiguously consent to, a removal petition within 30 days of service.")

    b.    **Diversity Jurisdiction Does Not Exist in this Case.**

Plaintiffs allege that Wyeth has failed to prove fraudulent joinder.[13] First, plaintiffs argue,

---

[13] A fraudulent joinder claim, plaintiffs argue, must be pleaded with particularity, supported by clear and convincing evidence, and proven with "certainty." *See Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921) ;*Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 259 (5th Cir. 1995).

According to plaintiffs, defendants bear a heavy burden to prove fraudulent joinder. *See Crowe v. Coleman*, 113 F.3d 1536 (11th Cir. 1997). Wyeth must show there is no possibility the plaintiff can establish a cause of action against any non-diverse defendant. *See Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353 (11th Cir. 1996)(*abrogated on other grounds*); *see also Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998).

In deciding whether fraudulent joinder exists, plaintiffs contend, the court may not move from the threshold jurisdictional issues into a decision on the merits. *See Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 112 (3rd Cir. 1990). Plaintiffs quote *Bryant v. Wyeth, et al.*, Order of Remand, CV-02-632-BH-M (S.D. Ala. Sept. 2002) as follows:

This court should not look for "a winning case against the allegedly fraudulent Defendant[s]," but merely for the Plaintiff's pleading "a possibility of stating a valid cause of action." This does not require that the Plaintiff's cause of action be certain under state law: "even an *arguable* cause of action" will survive the "possibility" test. *See Crowe v. Coleman*, 113 F.3d 1536, 1539-40 (11th Cir. 1997)(where the Plaintiff's Georgia-law nuisance claim survived this test, even though Georgia case law was in conflict of whether the conduct in question was actionable, and the

under the AMLA, plaintiffs' statute of limitations did not accrue until they were diagnosed with a legal injury.  Plaintiffs rely on *McCormick v. Aderholt*, 293 F.3d 1254 (11th Cir. 2002), which provides that when the wrongful act or failure to act and the legal injury do not occur simultaneously, the cause of action accrues and the limitations period commences when legal injury occurs. *See also Adams v. AHP Corp., et al.,* 122 F. Supp. 2d 1301 (M.D. Ala. 2000).

In *Adams*, plaintiffs assert, the federal district court faced with a strikingly similar "phen-fen" suit applied Alabama law and explained the accrual of an AMLA drug involving pharmaceutical drug use as follows: "The court rejects [American Home Products Corp.'s] argument that a cause of action for medical malpractice accrues when the tortious act or omission takes place, rather than when the plaintiff first suffers injury... it is firmly established that the clock does not begin to run on AMLA claims until the plaintiff first suffers injury.  *Id.* at 1304 (citations omitted).[14]  Plaintiffs provide the elements of a suppression of material fact claim: "(1) that the defendant suppressed a material fact, (2) that the defendant had a duty to communicate that material fact, either because of

_____

Georgia Supreme Court had not spoken on the issue)(emphasis added).  If the Plaintiff's claim is at least arguably viable under state law, joinder is legitimate.  *Id.*  Furthermore, "any ambiguity or doubt about substantive state law favors remand to state court." *Id.* at 1539.

[14] Plaintiffs also rely on *Garrett v. Raytheon Co.*, 368 So. 2d 516, 519 (Ala. 1979), *Ramey v. Guyton*, 394 So. 2d 2 (Ala. 1980), and *Pfizer , Inc. v. Farsian*, 682 So. 2d 405, 406 (Ala. 1996).  There, in *Garrett*, plaintiffs argue, the Alabama Supreme Court explained that the act complained of does not itself inflict a legal injury to a plaintiff at the time it is done but rather that injury follows as a result and subsequent development of the defendant's act.  In *Ramey*, plaintiffs contend, a defendant physician prescribed birth control pills to the plaintiff who suffered a stroke approximately one year later.  The Alabama Supreme Court dealing with accrual issues defined accrual as the date when the act complained of resulted in injury to the plaintiff.  The court explained that the plaintiff's AMLA action accrued on the day she suffered a stroke, not when the prescription was written.  In *Pfizer*, the plaintiff sued the manufacturer of a heart valve, alleging he had been fraudulently induced into receiving the valve because he had not been made aware of certain risks and/or defects in the product.  There, the Alabama Supreme Court stated: "Regardless of how Farsian pleads his claim, his claim is in substance a product liability/personal-injury claim - Farsian seeks damages because of the risk that his heart valve may one day fail . . . . Under Alabama law, Farsian's fear that his valve could fail in the future is not, without more, a legal injury sufficient to support his claim.  Although the facts . . . indicate that the ... heart valve has experienced problems . . ., Farsian's concern his heart valve, which is presently functioning normally, could later malfunction is not an injury recognized by Alabama law.

a confidential relationship between the parties, or because of the particular circumstances of the case, and (3) that the plaintiff suffered actual injury as a result of the suppression." *See Boswell v. Liberty Nat'l Life Ins. Co.*, 643 So. 2d 580, 581 (Ala. 1994)(Emphasis added).

Moreover, plaintiffs contend, the AMLA has not abrogated fraudulent concealment as a basis for a cause of action. *See Johnson v. McMurray,* 461 So. 2d 775, 778 (Ala. 1984). For persons standing in a confidential relationship, plaintiffs argue, Alabama law imposes a duty on the part of the one to safeguard the interests of the other, and thus withholding material facts breaches that duty and constitutes actionable fraud. *Id. See also Chapman v. Rivers Constr. Co.*, 227 So. 2d 403 (1969). Dr. Belyeu, plaintiffs argue, stands in a confidential relationship with plaintiffs. Moreover, plaintiffs contend, they have clearly alleged in the complaint that Dr. Belyeu was negligent in failing to adequately warn them of the dangers and side effects associated with Pondimin and/or Redux and also engaged in fraud/fraudulent concealment by knowingly concealing the dangers associated with these drugs and failing to advise them to undergo a cardiovascular examination and/or echocardiogram examination. According to plaintiffs, accrual did not occur until they were diagnosed with VHD by way of the required testing under the specific terms a conditions of the nationwide class action settlement agreement – an echocardiogram, pulmonary function testing, VQ lung scan testing, etc.

Next, plaintiffs argue, Wyeth attempts to mislead this court about the "publicity" surrounding the withdrawal of Pondimin and Redux to attempt to show that had the plaintiffs acted "reasonably," they would have instituted their claims more than two years before actually doing so. Plaintiffs cite a number of articles which it describes as Wyeth's post-withdrawal "media blitz in which media

reports downplayed or contradicted the actual risks of the diet-drugs."[15] This information, plaintiffs argue, creates a material issue of fact for the jury about whether Wyeth participated in the publication and dissemination of information to the nationwide media which directly refuted the causal link between the ingestion of its diet drugs and injuries such as those of the plaintiffs. As such a question of fact exists, plaintiffs contend, "there unquestionably exists a 'colorable' claim."

Furthermore, plaintiffs argue, Wyeth has failed to specifically identify when it believes plaintiffs' causes of action accrued. Here, plaintiffs assert, they were not medically diagnosed with VHD due to diet drug use until 2002.[16] Because of the discovery rule, plaintiffs argue, there is a factual question whether plaintiffs had sufficient information prior to diagnosis to know that they suffered a Fen-Phen related injury caused by Wyeth. According to plaintiffs, Wyeth has failed to explain how a reasonable individual could possibly conclude that plaintiffs failed to act with reasonable diligence in discovery their VHD and its causal relationship to their diet-drug use, discovering Wyeth's culpable conduct, and thereafter filing a timely lawsuit. According to plaintiffs, Wyeth has contended that at the time of alleged accrual of the plaintiffs' claims, the medical community disputed what level of exposure to diet drugs caused VHD and PPH as well as what symptoms reflect "diet-drug" induced VHD and/or PPH.[17]

Plaintiffs pose the following questions as illustration of a genuine factual dispute and their "colorable" claims under Alabama law:

_____

[15] The court has considered but does not cite those articles here.

[16] The 2002 date, this court notes, does not appear to be in the complaint.

[17] Again, plaintiffs cite a lack of uniformity in media publicity surrounding "fen-phen" as well as representations by Wyeth in early media reports that the drugs were safe.

1. What would a reasonable diet-drug user have done in the face of conflicting media reports?

2. Were the media reports that were issued or published sufficient enough in substance, duration, form, and uniformity to constitute legal notice invoking the commencement of the accrual period?

3. Could a reasonable "diet-drug" user rely on the representations of Defendant Wyeth, both before and after the recall of the diet drugs, that the drugs were safe and/or caused no harm including, but not limited to, VHD and/or PPH?

4. Could a reasonable "diet-drug" user rely on the representations of Wyeth, both before and after the recall of the diet drugs, that the benefits of the drugs (*i.e., their efficacy*) were safe and the risks of harm including, but not limited to, VHD and/or PPH, slight or medically unfounded?

5. Would any medical test, if performed on the Plaintiff in or around 1997 as proposed by Defendant Wyeth have detected any *legal* injury? If so, would that injury have been severe enough to be a viable cause of action under Alabama law, not to mention compensable, since according to Defendant Wyeth, only injuries about a certain thresholds (*sic*) with regard to duration of "diet-drug" usage and certain medical tests are legally sustainable under the Settlement Agreement?

According to plaintiffs, the date when plaintiffs first discovered the existence of a legal injury is a fact issue to be decided by the jury. "[T]he question of when a cause of action was or should have been discovered is a question of fact for a jury." *Barton, et al, v. Amer. Red Cross*, 804 F. Supp. 1455, 1461 (M. D. Ala. 1992). Therefore, plaintiffs argue, since a jury may determine that plaintiffs' discovery rule claim is meritorious, plaintiffs have plead "colorable claims" against Dr. Belyeu. Plaintiffs also rely upon *Herring v. Shirah*, 542 So. 2d 271 (Ala. 1988), in which plaintiff alleged that she "suspected that Dr. Shirah had misdiagnosed her problem" and "she could not be sure that she had a claim until after the surgery and tests were performed and the lump was confirmed to be cancerous." Defendant physician then argued that the plaintiff "had sufficient facts to bring a claim" when examined by him and told that the breast lump "might be cancerous." The Alabama Supreme Court held that a question of fact precluded summary judgment on the issue of when the plaintiff should have discovered the cause of action.

11

Regarding Wyeth's emphasis on the media publicity surrounding problems and withdrawal of the diet drugs, plaintiffs argue:

> In justification of its improper removal of the case at bar, Defendant Wyeth, interestingly enough, appears to conclude that although the extensive publicity surrounding the removal of Pondimin and Redux from the market should have given the Plaintiffs the knowledge that they had a claim against Dr. Belyeu, the same publicity does not indicate that Defendant Doctor Belyeu fraudulently concealed the need for the Plaintiffs to undergo a complete cardiac examination or an echocardiogram which might have revealed "diet-drug" related injuries at that time. In essence, ...Wyeth concludes that, because of the immense publicity surrounding Pondimin and Redux's removal from the market, the Plaintiffs need not have relied upon their prescribing doctor, Defendant Doctor Belyeu, but should have relied on their own knowledge for medical advice and/or a medical diagnosis and, further, that this prevents the Plaintiffs from having a claim of fraudulent concealment against Defendant Doctor Belyeu.

However, plaintiffs contend, this court has no evidence to infer that the plaintiffs were aware or should have been aware of the cited publicity.

Plaintiffs then highlight thirty-eight cases remanding diet drug litigation back to state court.[18]

Turning to the alleged culpability of defendant Wyeth, plaintiffs argue, evidence at trial will show that Wyeth actively promoted both Pondimin and Redux through its sales force. Plaintiffs rely on the 1997 unpublished Texas case, *Heichel v. A.H. Robins Company, Inc.*, as evidence that sales representatives actively promoted Pondimin during the late 1980's and early 1990's by providing pre-printed Pondimin pads to prescribing physicians. *See Heichel*, 1997 WL 317054 (Tex App. 1st Dist. June 12, 1997). In *Heichel*, plaintiffs argue, the prescribing physician, the sales representative, and the sales manager for A.H. Robbins all testified to this effect. Plaintiffs argue: "Thus, even as far

---

[18] This court has considered but does not list these thirty-eight cases here. Additionally, this court notes, the Marshall case cited has not in fact been remanded. Instead, the magistrate judge's remand order was reconsidered by this court, which temporarily stayed the case.

back as 1988-89 Defendant Wyeth's predecessor's sales forces were not only promoting Pondimin, but were promoting the off-label use of their diet-drugs, as the preprinted pads also included a prescription for another diet-drug, Tenuate. Plaintiffs would respectfully remind this Honorable Court that encouraging 'off-label' use of any drug, including in combination with other pharmaceutical products, is a violation of established federal law and is considered a criminal act."

Furthermore, plaintiffs contend, Wyeth cannot plausibly deny that it marketed Pondimin and/or Redux to Dr. Belyeu, the prescribing physician. In this vein, plaintiffs explain that Redux was represented as the "chemical cousin" to Pondimin. According to plaintiffs, Pondimin contains a left-sided isomer and right-sided isomer (dex-fenfluramine), which are mirror images. The dex-fenfluramine is the active ingredient in Pondimin. Researchers allegedly isolated the dexfenfluramine, allowing Wyeth to obtain a license to manufacture, market, and district dexfenfluramine under the brand name Redux. The FDA approved Redux in Spring 1996, and according to plaintiffs, Wyeth began promoting the drug by way of sales representatives in Summer 1996. By plaintiffs' account, Wyeth provided the Redux sales force with promotional and education materials prior to and/or after the product launch to use in "detailing" physicians, and this materials included information regarding Pondimin. Moreover, plaintiffs contend, because Redux and Pondimin contain the same active ingredient, each doctor detail visit for one of the drugs also constituted a detail visit on the other drug. Thus, plaintiffs conclude, when a salesman presented that Redux was safe and effective, he was also telling the doctor that Pondimin was safe and effective, and vice versa.

Plaintiffs repeat their request for remand as well as Rule 11 sanctions, attorneys fees, and costs associated with the prosecution of their remand motion.

13

## II.    Wyeth's Response

### A.    SUMMARY

Wyeth argues that Dr. Belyeu has been fraudulently joined.  In nearly identical cases, Wyeth insists, the MDL court applying Alabama law found that alleged prescribing physicians were fraudulently joined.  *See Fredda Rainey v. Wyeth*, Memorandum and Pretrial Order No. 2886 at p. 7 (E.D. Pa. June 12, 2003) (denying plaintiff's motion to remand and finding the prescribing doctor fraudulently joined); *Loretta Ferrell v. Wyeth*, Memorandum and Pretrial Order No. 2996 at pp. 7-8 (Sept. 5, 2003)(applying Alabama law and pronouncing that the prescribing physician was fraudulently joined); *Yuvonne B. Wilson v. Wyeth*, Memorandum and Pretrial Order No. 3000 at pp. 1-2 (Sept. 8, 2003)(applying Alabama law and finding that plaintiffs' claims against prescribing doctor were time barred); *Dianne Smith v. Wyeth*, Memorandum and Pretrial Order No. 3247 at pp. 7-8 (Feb. 10, 2003)(finding plaintiffs claims against doctor were time barred).

Likewise, Wyeth argues, the MDL Court has repeatedly found local physicians to be fraudulently joined under Mississippi law.  *See French, et al. v. Wyeth*, Memorandum and Pretrial Order No. 3281 (Feb. 18, 2004) (denying eleven plaintiffs' motion to remand and holding that eleven Mississippi physicians were fraudulently joined); *Williams et al. v. Wyeth*, Memorandum and Pretrial Order No. 3304 (Feb. 24, 2004) (denying 39 plaintiffs' motion to remand in 5 cases and holding that physicians, anonymous detailers, and Wyeth employees were fraudulently joined); *Allen et al. v. Wyeth*, Memorandum and Pretrial No. 3305 (Feb. 24, 2004) (in 12 cases involving 256 Mississippi plaintiffs, holding that physician defendants were fraudulent joined); *Jamison v. Wyeth et al.*, Memorandum and Pretrial Order No. 3339 (March 5, 2004) (in 5 cases involving 485 Mississippi plaintiffs, holding that physicians and pharmacies were fraudulently joined); plaintiffs; physicians

fraudulently joined), etc.[19]

Wyeth highlights *Dianne Smith v. Wyeth*, CV-02-PT-1579 (N.D. Ala. 2002), a diet drug case in which transferred a pending motion to remand to the MDL after reasoning that the "[t]he MDL is better able to determine particularly the [prescribing physician] time of injuries issue" and that MDL is "also likely better able to uniformly decide the [prescribing physician] discovery of cause of action issue." *See* Def. Apdx. C. After transfer, Wyeth argues, the MDL Court applied Alabama law (citing *Ferrell* and *Rainey*) and found that plaintiff's claims against the prescribing doctor were time-barred. Wyeth requests that this court follow the MDL Court's decisions in *Rainey, Ferrell, Wilson*, and *Smith*, and find proper removal in this case.

In the alternative, Wyeth requests that this court transfer this case to the Multi-District Litigation ("MDL") proceeding, In Re Diet Drugs, MDL - 1203, in the Eastern District of Pennsylvania.

According to defendant Wyeth, plaintiffs cannot prevail on their claims against Dr. Belyeu based on the above-cited cases and for the following reasons[20]:

- Plaintiffs filed this lawsuit against Wyeth and Dr. Belyeu on April 15, 2004 over six years after plaintiffs last could have used Pondimin or Redux. The Alabama statute of limitations for medical malpractice claims begins to run from the date the plaintiffs are first injured. A claim for malpractice is timely only if brought within two years of first injury, and under any circumstances, no more than four years later. Thus, plaintiffs necessarily had to file their claims against Dr. Belyeu in 1999 to prevent their claims against Dr. Belyeu from being time barred. Plaintiffs did not do so.

- Because plaintiffs delayed over six years in suing Dr. Belyeu, plaintiffs now seek to argue that their claims against Dr. Belyeu are timely because they first sustained valve injury from Pondimin and/or Redux not at the time they used the prescriptions, but years later. Plaintiffs are judicially estopped from advancing that argument.

---

[19] This court does not recited all of these cases here. They have been attached as Def. Apdx. B.

[20] These bullet points are taken verbatim from Wyeth's brief.

Having previously argued that Pondimin and Redux are not capable of causing latent heart valve injury in order to convince the MDL Court to accept and approve the Settlement, plaintiffs cannot now take the contrary position.

• The scientific and medical studies done on the risks of Redux and Pondimin prove the absence of any latency related to the medicines. This Court received evidence on the latency issue and conclusively decided that Redux and Pondimin do not cause latent heart valve injury.

• Plaintiffs are members of a nationwide class that has entered into a settlement agreement ("Settlement") approved by this Court in In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation, in the United States District Court for the Eastern District of Pennsylvania, MDL Docket Docket No. 1203 (hereinafter "In re Diet Drugs"). Plaintiffs bring this lawsuit pursuant to Intermediate Opt-Out rights created by the Settlement, exercising a purported right under the Settlement to seek recovery in the tort system rather than to accept the financial benefit available in the Settlement.[21]

• In convincing the MDL Court to approve the Settlement, plaintiffs, through counsel, argued that Wyeth's diet drug medications cause heart valve injury at the time of use, and not years after discontinuation. Indeed, there is no evidence to the contrary. The MDL judge received the evidence on this issue and, in approving the Settlement, conclusively decided that Wyeth's diet drug medications do not cause latent heart valve injury. Stated differently, the MDL judge decided that insofar as Redux and Pondimin cause heart valve injury, if at all, plaintiffs sustain such injury while using the medications (or shortly thereafter) and not years later.

• Accordingly, applying the science and MDL Court's factual finding, if plaintiffs have heart valve injury caused by their use of Pondimin and/or Redux, their injuries must have occurred in 1997, or shortly thereafter.

• Although plaintiffs attempt to skirt their statute-of-limitations problem by claiming that they did not learn of their injuries until six months before this lawsuit was filed, plaintiffs' admission in their brief that they were diagnosed with heart valve damage in 2002 (Plaintiffs' Brief in Support of Motion to Remand and Motion for Sanctions ("Plaintiffs' Brief") at p.14) and the forms plaintiffs signed on April 17, 2003 in order to exercise their Intermediate Opt-out rights (Exhibit 5 to Notice of Removal) demonstrate that plaintiffs' assertion is patently false. Plaintiffs failed to file suit within six months of their "discovery" of their alleged injuries. Thus, the sixth-month tolling provision of the Medical Liability Act is inapplicable, and plaintiffs' claims

---

[21] Defendant Wyeth notes that plaintiffs have attached to the complaint a copy of their intermediate opt-out forms.

are untimely.

In conclusion, Wyeth asserts, plaintiffs' claims against Dr. Belyeu are barred by the two-year statute of limitations and the four-year statute of repose, and plaintiffs have no possibility of succeeding on those claims.

## B.    WYETH'S STATEMENT OF FACTS

On April 15, 2004, plaintiffs Harvell and Scarbrough filed this lawsuit. According to Wyeth, plaintiffs fail to identify which of the two drugs each ingested (instead stating "Pondimin and/or Redux"). Moreover, Wyeth notes, plaintiffs' complaint and motion papers omit allegations regarding when Dr. Belyeu prescribed Pondimin and/or Redux for them and when they last saw Dr. Belyeu for medical treatment.

Prior to September 15, 1997, Wyeth distributed Redux and Pondimin for use in accordance with FDA-approved prescribing information and subject to the warnings, precautions, and contraindications stated therein. *See* Wyeth's Answer, ¶ 2. It is undisputed, Wyeth asserts, that on September 15, 1997, AHPC (Wyeth's predecessor corporation) voluntarily withdrew Redux and Pondimin from the market. Thus, Wyeth contends, Dr. Belyeu could not have prescribed Pondimin and/or Redux to plaintiffs after September 15, 1997. Among other allegations in the complaint,[22] Wyeth notes, plaintiffs allege that their "suit was instituted within two (2) years of the Plaintiffs first being conclusively diagnosed with an injury as a result of their diet drug use; specifically, when she [sic] was first medically diagnosed with legal injury and/or damage as complained of herein." *See* Compl, ¶ 102. In their brief in support of remand, plaintiffs claim that they "were not medically

---

[22] Wyeth summarizes a number of portions of the complaint already discussed earlier in this memorandum opinion.

diagnosed with VHD due to 'diet drug' use until 2002."

On April 17, 2003, Wyeth asserts, plaintiffs each filed an Intermediate Opt-Out form to the Settlement Agreement, in which each plaintiff certified that she was qualified to exercise such a right under the Settlement Agreement. That Settlement Agreement provides that in order to exercise an intermediate opt-out right, plaintiffs must meet certain medical criteria as carefully defined in the Settlement Agreement, including a requirement that plaintiffs must have been diagnosed with "FDA positive" levels of heart valve regurgitation. *See* Settlement Agreement § IV.D.3.a.

### C.   ARGUMENTS

1.   **The court should be vigilant in protecting Wyeth's right of removal.**

The Supreme Court has instructed federal district courts to protect vigilantly a defendant's right to proceed in federal court by not "sanction[ing] devices intended to prevent a removal to a Federal court where one has that right ... [and being] equally vigilant to protect the right to proceed in the Federal court as to permit the state courts, in proper cases, to retain their own jurisdiction." *See Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907). The Fourth Circuit similarly observed: "Congress created the removal process to protect defendants. It did not extend such protection with one hand, and with the other give plaintiffs a bag of tricks to overcome it." *See McKinney v. Bd. of Trustees of Md. Cmty. Coll.*, 955 F.2d 924, 928 (4th Cir. 1992).

According to Wyeth, plaintiffs' counsel are in the habit of joining resident defendants even though they have no reasonable basis for a claim against them and no intent to pursue them to judgment. In such cases, Wyeth asserts, courts have held parties to be fraudulently joined. *See Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996). The Eleventh Circuit, Wyeth argues, has held that a defendant is fraudulently joined when the plaintiff has no reasonable

18

basis for a claim against the defendants. *See Crowe v. Coleman*, 113 F.3d 1536, 1540 (11th Cir. 1997) (There must be a "reasonable basis for predicting that state law might impose liability" on the non-diverse defendants.)

  2.  **Plaintiffs' motion to remand fails because a fraudulently joined party need not join in the removal.**

    According to Wyeth, plaintiffs' argument that Wyeth's removal is defective because Dr. Belyeu has not joined in and consented to the removal is meritless. Fraudulently joined parties, Wyeth contends, need not consent to removal because they are not real parties to the litigation and have no input on whether a case should remain in federal court or be remanded to state court. *See, e.g. Erkins v. American Bankers Ins. Co.*, 866 F. Supp. 1373, 1375 (N.D. Ala. 1994) ("'[I]t is not necessary that a fraudulently or improperly joined defendant join with the other defendants in a petition for removal. ..' ") (citations omitted); *Jernigan v. Ashland Oil*, 989 F.2d 812, 815 (5th Cir. 1993). Since Dr. Belyeu was fraudulently joined, Wyeth contends, he need not have consented to removal.

  3.  **Dr. Belyeu is fraudulently joined because plaintiffs' claims against him are time-barred**.

    Again, Wyeth emphasizes, plaintiffs' complaint was filed more than six years after Dr. Belyeu could have prescribed the diet drugs at issue to plaintiffs due to its withdrawal from the market in 1997.

    a.  **The AMLA Sets Forth a Two-Year Limitations Period and a Four-Year Repose Period on Plaintiffs' Malpractice Claim.**

    Under Alabama law, Wyeth argues, all of a patient's claims against her physician that arise from the physician-patient relationship are governed by the Alabama Medical Liability Act

("AMLA").  *See Horn v. Citizens Hosp.*, 425 So.2d 1065, 1070 (Ala. 1982).  Alabama Code §6-5-482 of the AMLA provides that "all actions against physicians, surgeons, dentists, medical institutions or other health care providers [for malpractice] ... must be commenced within two years next after the act, or omission, or failure giving rise to the claim. .. " Ala. Code § 6-5-482 (a).[23]  If the cause of action is not discovered and "could not reasonably have been discovered within such period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier; provided further that in no event may the action be commenced more than four years after such act or omission ...." Ala. Code § 6-5-482(a) (emphasis added).

This statute of limitations (as well as the statute of repose) for malpractice, Wyeth asserts, "begins to run when the first injury, however slight, occurs, even though that injury may later become greater or different," *see Free v. Granger*, 887 F.2d 1552, 1555 (11th Cir. 1989), and whether or not the full amount of damage is apparent at the time of the first legal injury. *See Barton v. American Red Cross*, 804 F. Supp. 1455, 1459 (M.D. Ala. 1992).

---

[23] Wyeth also argues that plaintiffs' claims against Dr. Belyeu do not meet the AMLA's strict requirements enumerated in Alabama Code section 6-5-548(a)(1993), 6-5-551, and *Williams v. Spring Hill Memorial Hosp.*, 646 So. 2d 1373 (Ala. 1994).  The former provides: "In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in a like case."  *Williams* held that the plaintiff in a medical malpractice case must establish that the defendant breached the standard of care and that this breach proximately caused plaintiff's injuries.  Furthermore, Wyeth asserts, section 6-5-551 provides: "In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render th health care provider liable to plaintiff ... Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief can be granted."

In this case, Wyeth argues, the complaint does not allege a breach of the standard of care by Dr. Belyeu or evidence of such a breach.

**b.      The Science Demonstrates that Injury from Redux and Pondimin, if any, Begins with Use.**

Wyeth refers to extensive scientific and medical studies on the risks of Pondimin and Redux, proving the absence of any latency related to the medicine.  If Pondimin and Redux cause injury to the heart, Wyeth argues, they cause such injury at the time of use, not later.  Wyeth cites the following studies[24] as establishing this principal:

- Gardin, Julius M., M.D., et al., One Year Echocardiographic Follow-Up of Patients Previously Treated with Phentermine-Fenfluramine or Dexfenfluramine, Circulation, October 31, 2000, Vol. 102, No. 18, p. 11-474

- Davidoff, Ravin, M.D., et al., Echocardiograph Examination of Women Previously Treated with FenFluramine, ArchIntern Vol. 161, June 11, 2001.

- Eichelberger, James, M.D., et al., 15 year Outcome Data on Patients Treated with Fenfluramine/Phentermine Combination, 12 J. Am. Socy. Echo. 355 (1999).

- Gardin, Julius, M., M.D., et al., Valvular Abnormalities and Cardiovascular Status in Patients Following Exposure to Dexfenfluramine or Phentermine/Fenfluramine, 283 JAMA 1703 (April 5, 2000).

- Hensrud, Donald, M.D., et al., Echocardiographic Improvement Over Time After Cessation of Use of Fenfluramine and Phentermine, 74 Mayo Clini. Proc. 119197 (1999).

- Mast, Steven T., M.D., et al., The Progression of Fenfluramine-Associated Valvular Heart Disease Assessed by Echocardiography, 134 Annals of Internal Medicine (Feb. 20, 2001).

- Weissman, Neil J., M.D., et al., Natural History of Valvular Regurgitation 1 Year After Discontinuation of Dexfenfluramine Therapy, 134 Ann. Intern. Med. 267 (2001).

- Weissman, Neil J., M.D., et al., Prevalence of Valvular-Regurgitation Associated With Dexfenfluramine Three to Five Months After Discontinuation of Treatment, New Engl. Journal of American College of Cardiology, December 1999; Vol. 34, No. 7, pp. 2088-2095.

---

[24] These studies are attached as Def. Apdx. D.

21

Notably, Wyeth contends, no epidemiological studies to the contrary exist.  Thus, Wyeth argues, plaintiffs' allegations that they suffered their first injury from Pondimin and/or Redux years after they discontinued use has no basis.

     c.     **The MDL Court Has Determined that Injury Begins with Use of Diet Drugs, Not Later.**

Indisputably, Wyeth argues, plaintiffs have acknowledged that they belong to the settlement class covered by the nationwide class action settlement agreement, which was approved by the MDL court after an extensive adversarial hearing to assess its fairness.  *See In re Diet Drugs*, Pretrial Order No. 1415 ("Order Approving Settlement"), 2000 WL 1222042 (ED.Pa. Aug. 28, 2000).  According to the Order Approving Settlement, during the fairness hearing, Judge Bechtle received testimony from twenty-one witnesses, including numerous physicians and scientists, about various aspects of the settlement.  *Id.* at **6-9.  Judge Bechtle also reviewed "a substantial amount of medical testimony and evidence, including approximately ninety clinical and epidemiological studies" on the risks created by diet drugs, *id.* at *8,[25] and determined that "[a]s the result of the unprecedented amount of study that diet-drug related valvulopathy has received," he could reach "reliable conclusions regarding the nature of the disease process, the effect of duration of use, latency, progression, incidence and prevalence." *Id.* at * 14 (emphasis added).

Regarding latency, Wyeth argues, Judge Bechtle concluded that there was no delay between Wyeth's weight-loss medications and the development of heart valve injury and specifically concluded:  "There is no evidence that the use of the drugs results in any increased risk of

_____

[25] Wyeth points out that there were up to thirty class member objectors to the Settlement who were provided a "full and fair opportunity to offer all of the evidence that they wished to tender to the court concerning the proposed nationwide class action Settlement Agreement."  *See* Exhibit 2 to Notice of Removal at p.18.

22

regurgitation that is 'latent.'" *Id.* at *46 (E.D. Pa. 2000).[26]  Wyeth argues: "In other words, if Redux

and Pondimin cause injury, they cause injury at the time of use, not later."  Wyeth quotes the MDL

court as follows:

> Objectors [to the Settlement] argue that a "futures" problem similar to that in Amchem exists here because issues regarding the latency and progress of [heart valve injury] remain vague. The clinical and epidemiological studies demonstrate - - and all experts agree - - that insofar as the use of fenfluramine or dexfenfluramine results in an increased prevalence of valvular regurgitation, that regurgitation is detectable by echocardiogram shortly after the patients discontinue the use of diet drugs. Conversely, there is no evidence that the use of the drugs results in any increased risk of regurgitation that is "latent"...

> The absence of a latency period between ingestion of [diet drugs] and the development of clinically detectable [valvular heart disease] is also confirmed by a number of studies that have followed former [diet drug] patients for a number of years, either through the use of echocardiograms or comprehensive medical review. Each of these studies finds that there was no emergence of new disease after some latency period ...

> The objectors presented no evidence from any study to support the contrary view that such valvulopathy is either latent or that it progresses ...

*See* 2000 WL 1222042 at *46.  Wyeth again notes that this ruling was made after an adversarial

hearing at which the available medical evidence was argued on both sides of this issue.

Notably, Wyeth argues, the MDL Court has applied its latency findings from Pretrial Order

No. 1415 in a number of diet drug cases filed in Alabama and transferred to the MDL Court.  In

*Rainey*, *see supra*, Judge Bartle cited Pretrial Order No. 1415 and found: "Since there is no latency

period between ingestion of Pondimin and any injury, plaintiff's injury at the latest commenced, and

thus the limitations period began to run, shortly after Pondimin went off the market in late 1997."[27]

---

[26] Plaintiffs assert that Wyeth cannot use Judge Bechtle's findings, *see infra*.

[27] Incidentally, this court notes, the MDL in *Rainey* and other cases applied the fraudulent joinder of the Third Circuit.

The MDL Court then denied plaintiff Rainey's motion to remand.  Wyeth also relies on *Ferrell*, *see supra*, in which the MDL Court also applied Alabama law and pronounced the prescribing physician fraudulently joined: "Since there is no latency period between ingestion of Pondimin and any injury, plaintiff's injury at the latest commenced, and thus the limitations period began to run, shortly after the diet drugs were pulled from the market in September, 1997." Loretta Ferrell, Exhibit 3 to Notice of Removal at pp. 7-8.  Wyeth also relays the holdings of *Wilson* and *Smith*, recited earlier in this memorandum opinion.  Based on these rulings, Wyeth contends, plaintiffs' injuries at the latest commenced (and thus the limitations period on their claims against Dr. Belyeu began to run) in 1997, when they last could have used Pondimin and/or Redux.

          **d.**     **Plaintiffs are Judicially Estopped from Arguing that Their Injuries Occurred Later.**

According to Wyeth, plaintiffs now take the opposite position and argue that Pondimin and Redux are capable of causing heart valve injury not at the time of use but years after discontinuation of the medications.  However, Wyeth asserts, judicial estoppel prevents plaintiffs from making this argument.

Judicial estoppel "bars a litigant from asserting a position that is inconsistent with one he or she previously took before a court." *See Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001). Judicial estoppel applies where: (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the harm identified and no lesser sanction would address the damage done by the party's

misconduct. *Id.* at 777-78; *see also, e.g., Carrasca v. Pomeroy*, 313 F.3d 828, 835 (3d Cir. 2002).

All three criteria, Wyeth asserts, have been met. First, Wyeth contends, plaintiffs' current argument is irreconcilably inconsistent with their previous position before the MDL Court through Class Counsel. According to Wyeth, plaintiffs' arguments that their injuries occurred long after they quit taking Pondimin and/or Redux directly contradicts the arguments made by Class Counsel made to convince the MDL Court to approve the settlement, which was that there is no latency period between the use of Pondimin and Redux and the development of heart valve injury.

Second, Wyeth argues, plaintiffs' change in position threatens the MDL Court's authority and integrity. Wyeth accuses plaintiffs of "taking advantage of their rights under the settlement by filing this suit pursuant to rights provided under the settlement while at the same time taking a position opposite to the one they took in order to gain those rights." By Wyeth's account, plaintiffs' claims against Wyeth would <u>also</u> have been time-barred but for the settlement, which prohibits Wyeth from asserting a limitations defense against them. *See* 2000 WL 1222042 at *25. Wyeth cites *Ryan Operation G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996) ("[J]udicial estoppel is particularly appropriate in situations ... where the party benefitted from its original position' ... [because] the tribunal has acted in reliance on the party's initial assertion, and thus the threat to the integrity of the judicial process from subsequent assertion of an incompatible position is more immediate") (*quoting Delgrosso v. Spang & Co.*, 903 F.2d 234, 242 (3d Cir. 1990)) (other citations omitted).

Third, Wyeth argues, applying judicial estoppel here will bolster the MDL Court's authority and the integrity threatened by plaintiffs' attempts to benefit from inconsistent positions. Judicial estoppel, Wyeth asserts, prevents a plaintiff froming "play[ing] fast and loose with the court." *See,*

*e.g., Montrose*, 243 F.3d at 779 (citation omitted).

      e.      **The AMLA's Discovery Provision Does Not Extend Plaintiffs' Claims.**

Wyeth quotes the AMLA's tolling provision as follows: "[I]f the cause of action is not discovered and could not reasonably have been discovered within such period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier." *See* Ala. Code § 6-5-482(a). Wyeth deems plaintiffs' reliance on this discovery provision mistaken. First, Wyeth notes, in their brief plaintiffs admit that they were diagnosed with alleged valve injuries more than six months before filing suit. Additionally, Wyeth points out, the intermediate opt-out forms attached to plaintiffs' complaint demonstrate that plaintiffs were diagnosed with alleged heart valve injuries nearly one year before they filed this lawsuit, since Harvell and Scarbrough each filed an Intermediate Opt-Out form to the Settlement Agreement on April 17, 2003. These Intermediate Opt-Out forms show representation by present counsel, Morris and McAnnally, LLC, in April 2003. Moreover, Wyeth argues, each plaintiff certified that she was qualified to exercise an intermediate opt-out right under the Settlement Agreement, e.g., that she met certain medical criteria as carefully defined in the Settlement Agreement, including a requirement that plaintiffs must have been diagnosed with "FDA positive" levels of heart valve regurgitation. See Settlement Agreement § IV.D.3.a. Accordingly, Wyeth contends, plaintiffs must have "discovered" any injury they had before April 17, 2003, when they signed their opt-out forms and certified that they were eligible to exercise Intermediate Opt Out rights.

Wyeth asserts that under either scenario - discovery in 2002 as admitted in their opposition brief or discovery in April 2003 as evidenced by their opt-out forms - plaintiffs failed to file suit

within six months of their "discovery" of their alleged injuries. As such, Wyeth argues, the discovery provision of the AMLA do not help plaintiffs in this case.

Furthermore, Wyeth argues, plaintiffs' reliance on the tolling provision of the AMLA is misplaced because the extensive national and local publicity arising from the withdrawal of Pondimin and Redux from the market in September 1997. This publicity, Wyeth argues, put diet drug users on notice that they should consult a physician. Had plaintiffs consulted a physician, Wyeth urges this court, they would have discovered at that time any injuries they might have sustained.

When it withdrew Pondimin and Redux from the market in 1997, Wyeth alleges, it took out full-page advertisements in leading national and regional newspapers announcing this decision. The ads stated that "patients who have used either Pondimin or Redux should contact their physicians" and also warned that abnormal heart valves had been detected in former diet drug users who had no symptoms. The FDA's September 15, 1997 press release also announced the withdrawal of these products, explaining that the drugs were being withdrawn based on echocardiogram findings in diet drugs users: "These findings indicate that approximately 30 percent of patients who were evaluated had abnormal echocardiograms, even though they had no symptoms. This is a much higher than expected percentage of abnormal results."

According to Wyeth, all three national network news programs prominently covered the diet drugs withdrawal and the possible link to heart valve regurgitation. For example, on September 15, 1997, Tom Brokaw began the NBC Nightly News as follows: "Good evening. Two of the most popular diet drugs in America are off the market tonight, recalled by their manufacturers after a wave of reports that they can bring on heart problems."

27

In November 1997, Wyeth notes, the United States Department of Health and Human Services published health recommendations for former users of Pondimin and Redux, recommending that all former users of diet drugs should see their physicians. *See* Def. Apdx. H. This recommendation led to another "massive wave of publicity," Wyeth alleges, including stories and articles in both the national and local television news and newspapers. *Id.* In August 1999, Wyeth asserts, another "wave of publicity" followed a Texas jury award to plaintiff Debbie Lovett of over $34 million in damages for injuries allegedly caused by her ingestion of Redux. Wyeth points to extensive reporting of this verdict by local and national media. *See* Def. Apdx. I. Finally, Wyeth argues, in 1999 and 2000, another wave of publicity followed the Nationwide Diet Drug Class Action Settlement in both the national and local media. In fact, Wyeth asserts, this publication was part of an "elaborate and extensive plan of notice" designed to ensure that notice would reach all those affected by the settlement as practicably as possible, as Judge Bechtle explained in his subsequent opinion approving the Settlement as fair, reasonable, and adequate. The notice program approved by Judge Bechtle, Wyeth alleges, included a campaign in November 1999 and extending into January and February 2000 which "employed sophisticated media techniques designed to reach all class members." That campaign used television messages that were broadcast 781 times for six consecutive weeks on various cable networks. The television message stated:

> If you took the diet drug combination known as FenPhen or the diet drugs Pondimin or Redux, you may have heart valve problems and not know it. As a result of the proposed class action settlement, you could be eligible for free medical testing and compensation. But you must act promptly. You must decide whether to participate in this settlement by March 30, 2000. If you do nothing, your legal rights will be affected. Call 1-800-386-2070 today.

*See* 2000 WL 1222042, at *35. According to Wyeth, the Settlement was first announced when a Memorandum of Understanding was signed in October 1999, and the final agreement was signed

November 18, 1999 and tentatively approved by Judge Bechtle on November 23, 1999. Id. at *5.

According to Wyeth, a summary notice was also published and appeared repeatedly in magazines including *Parade*, *People*, *Time*, *Ladies Home Journal*, *Redbook*, and *Good Housekeeping*. Wyeth observes that banner ads were also developed for the Internet and notices were published in national and local newspapers and in a variety of publications targeted to healthcare providers and pharmacists.

Wyeth quotes Judge Bechtle in Pretrial Order No. 1415: "The media program ... was highly successful," in part because it was "greatly enhanced by the enormous publicity that has surrounded the diet drugs involved in this litigation and the publicity of this Settlement."[28] Thus, Wyeth argues, it is undisputed that the publicity surrounding the diet drug litigation was prolonged and pervasive. According to Wyeth, plaintiffs have not denied that they received some or all of the publicity. In light of such extensive publicity, Wyeth contends, plaintiffs are charged with constructive knowledge of the facts underlying their cause of action. *See United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980) ("Where events receive ... widespread publicity, plaintiffs may be charged with knowledge of their occurrence."); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548(6 th Cir. 2000) (applying objective standard to charge plaintiff with knowledge, even though she denied any exposure to relevant media coverage); *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir. 1995) ("[T]o determine if inquiry notice has been triggered an objective `reasonable' diligence standard must be applied to the facts."); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987) ("[T]he extent to which a plaintiff used reasonable diligence is tested by an objective

---

[28] A media analysis cited in that Pretrial Order found that 97% of women between the ages of 25 and 54 viewed one or more forms of televised or printed notice an average of 10 times, and almost 80% of women in the same age group were exposed to the televised or printed notice a minimum of five times. *Id.* at *36 n. 16.

standard."). By Wyeth's account, plaintiffs clearly discovered their cause of action by the time they

executed their opt-out forms. At that time, Wyeth repeats, they had already hired their lawyers.

Wyeth argues: "Given the publicity associated with the withdrawal of Pondimin and Redux in 1997,

the multibillion dollar settlement of the national class action suit in 1999, and the on-going diet-drug

litigation, no reasonable fact finder could conclude that plaintiffs' causes of action could not

reasonably have been discovered more than six months before they filed suit in April 2004.

Accordingly, the tolling provision of the AMLA is not available to the plaintiffs."

Citing this widespread publicity, Wyeth contends, federal courts in Oklahoma have found

fraudulent joinder of doctors in diet drug cases nearly identical to this one. Wyeth relies on *Karen*

*Moseley v. Wyeth*, in the United States District Court of the Western District of Oklahoma, No.

CV-02-1120-M. There, Wyeth contends, plaintiff sued Wyeth and her prescribing physician,

claiming that her injuries from Redux were not discovered and could not reasonably have been

discovered until within the two-year period before she filed suit in 2002. In its September 13, 2002

order denying remand, *see* Def. Apdx. K, the Oklahoma federal court described the media coverage

prior to the diet drugs' withdrawal from the market, the extensive news surrounding the drugs'

withdrawal, the coverage of the various verdicts and settlements in the diet drug litigation, and the

media attention to the national class action settlement in the MDL. The *Moseley* court, Wyeth notes,

concluded:

> [R]esolving all disputed questions of fact and any uncertainties as to the current state
> of controlling substantive law in favor of plaintiff, the Court finds Wyeth has proven
> by clear and convincing evidence that plaintiff's claims against [the prescribing
> physician] are barred by the statute of limitations and there is no possibility that
> plaintiff could recover against [the physician]. Specifically, the Court finds the
> widespread media coverage surrounding the Phen-Fen diet drugs from September
> 1997 through February 2000 is more than sufficient to impute knowledge to plaintiff

about her claims against [the doctor]. <u>The Court further finds plaintiff, through the exercise of reasonable diligence, should have know of the existence of her injuries more than two years prior to the date plaintiff filed the instant action.</u>[29]

Wyeth asks that this court adopt the reasoning of *Moseley* and the other cited cases and find that plaintiffs were on inquiry notice of any alleged injuries well before two years prior to the filing of their lawsuit. Thus, Wyeth argues: "[T]he statute of limitations and statute of repose on plaintiffs' claims against Dr. Belyeu began to run at least in 1997, when Dr. Belyeu could have last prescribed Pondimin and/or Redux for plaintiffs and when they reasonably should have discovered any injuries of which they now complain."

### f. Plaintiffs' Fraudulent Concealment Claim Also Has Expired.

In their fraudulent concealment claim, plaintiffs alleged that Dr. Belyeu failed "to advise the Plaintiffs of the possible dangers associated with the drugs, and/or ... to alert the Plaintiffs of her [sic] need to undergo a cardiac evaluation." *See* Compl, ¶ 102.  In their brief in support of remand, plaintiffs further allege that Dr. Belyeu knew he had given plaintiffs Pondimin and/or Redux, knew that they were withdrawn from the market due to health concerns, and knew that diet drug users should undergo an echocardiogram or cardiovascular exam related to their diet drug use.  According to plaintiffs, Wyeth argues, Dr. Belyeu supposedly concealed this information from them.  However, Wyeth contends, plaintiffs do not allege any ongoing patient-doctor relationship with Dr. Belyeu beyond his alleged prescriptions of the diet drugs in the first instance.

According to Wyeth, the fraudulent concealment claim against Dr. Belyeu is legally flawed. The AMLA expressly incorporates Section 6-2-3 of the Alabama Code, the statute of limitations for

---

[29] Wyeth lists a number of cases from other jurisdictions linking the plaintiffs' notice to the extensive publicity. *See* Def. Apdx. L-T.  The court has considered these citations fully but does not repeat them here.

fraud.  Under Ala. Code § 6-2-3, Wyeth asserts, "[i]n actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action."  However, Wyeth contends, this incorporation does not obviate the AMLA's statute of repose.  Reading section 6-2-3 with the AMLA, Wyeth notes, Alabama law requires that a malpractice claim for fraud be filed "no more than four years after the act, omission, or failure complained of...."  *See* Ala. Code 6-5-482(b). *See, e.g., Trammer v. Bernstein*, 596 So.2d 572, 575 (Ala. 1991) (finding that plaintiff's malpractice action for fraud must be brought within two years discovery of the fraud and within four years of the act or omission of which plaintiff complains).  Here, Wyeth argues, Harvell's and Scarbrough's alleged injuries occurred, if at all, in 1997 at the time of they last could have used diet drugs, and Dr. Belyeu's alleged fraudulent concealment of this fact cannot extend plaintiffs' claim beyond the four-year period of repose.

Moreover, Wyeth argues, a fraud claim, including fraudulent concealment, accrues under Alabama law on the date the fraud was discovered or should have been discovered in the exercise of reasonable diligence.  *See Auto-Owners Ins. Co. v. Abston*, 822 So.2d 1187, 1194 (Ala. 2001).[30] *See also Hughes v. Cloud*, 504 So.2d 734 (Ala. 1987) (statute of limitations for fraud begins when the fraud is readily discoverable or when plaintiff is on notice that a fraud may have been

---

[30] Additionally, Wyeth deems the fraudulent concealment claim deficient under Fed. R. Civ. P. 9(a). See, e.g., *Moseley v. Wyeth*, Def. Apdx. K at p. 5 ("To avoid the statute of limitations ... plaintiff asserts the statute of limitations should be tolled as to her claims against [the doctor] as a result of his fraudulent concealment of the dangers of Pondimin. However, a careful review of plaintiff's complaint and other submissions shows plaintiff has set forth no factual allegation supporting her claim of fraudulent concealment... [P]laintiff simply sets forth conclusory allegations that [the doctor] fraudulently concealed the dangers of Pondimin and the need for her to undergo an echocardiogram and fails to provide any factual basis to support these conclusory allegations.  The Court, accordingly finds no basis for tolling the statute of limitations.").

perpetrated); *Haaker v. Lawson*, 497 So.2d 99 (Ala. 1986) (begins to run from date of discovery or date that fraud should have been discovered). Wyeth repeats its argument that the media publicity before and after the national settlement triggered notice or should have, in the exercise of reasonable diligence triggered notice to plaintiffs of their alleged fraudulent concealment claim against Dr. Belyeu.

       **g.**     **Prior Remand Decisions Cited by Plaintiffs**

Despite plaintiffs' arguments to the contrary, Wyeth argues, *Mary Claire Adams v. AHPC* does not support remand. There, the plaintiff was prescribed the diet drug at issue for a one year period "beginning in 1996." *See* Def. Apdx. U at 4. Plaintiff filed her lawsuit on September 27, 2000. Thus, Wyeth argues, the *Adams* time gap between last use of the drug and the filing of lawsuit pales in comparison to the over six-year chasm between plaintiffs' use of Pondimin and/or Redux (ending in 1997, at the latest) and their filing of this lawsuit (in April 2004).

Moreover, Wyeth contends, the *Adams* remand order must have been entered without the benefit of Judge Bechtle's August 28, 2000 Order Approving Settlement, PTO 1415, in which Judge Bechtle recognized the lack of any latency period between the use of diet drugs and injuries from such use.[31] Because all appeals of the Order Approving Settlement had not been exhausted, Wyeth argues, the order was not brought to Judge Dement's attention in *Adams* or cited in opposition to remand. This court, on the other hand, Wyeth contends, has the benefit of Judge Bechtle's ruling on latency, which was binding on plaintiffs as members of the settlement class when the Order Approving Settlement was issued.

Wyeth reminds the court that the MDL Court interpreted PTO 1415 and applied it in four

---

[31] Plaintiffs' arguments in this regard are provided *infra*.

33

Alabama cases: *Fredda Rainey v. Wyeth*, Memorandum and Pretrial Order No. 2886 at p. 7 (E.D. Pa. June 12, 2003), *Loretta Ferrell v. Wyeth*, Memorandum and Pretrial Order No. 2996 at pp. 7-8 (Sept. 5, 2003), *Yuvonne B. Wilson v. Wyeth*, Memorandum and Pretrial Order No. 3000 at pp. 1-2 (Sept. 8, 2003), and *Dianne Smith v. Wyeth*, Memorandum and Pretrial Order No. 3247 at pp. 7-8 (Feb. 10, 2003). In each case, the prescribing physician was found to be fraudulently joined.

Additionally, Wyeth argues, the *Bryant* decision relied on by plaintiffs was incorrectly decided. In that case, Wyeth contends, Judge Hand neither addressed the fact that a claim for malpractice "begins to run when the first injury, however slight, occurs, even though that injury may later become greater or different", *see Free v. Granger*, 887 F.2d 1552, 1555 (11th Cir. 1989), nor squarely addressed the effect of massive publicity surrounding the withdrawal of Pondimin and Redux from the market, the diet drug verdicts, and the class action settlement.[32] Therefore, Wyeth insists, Judge Hand appeared to accept at face value plaintiffs' self-serving proposition that Ms. Bryant did not actually discover the prescribing doctor's fraudulent concealment until shortly before filing of the lawsuit, without considering the fact that plaintiff reasonably could have or should have discovered her claim for fraud earlier based on the publicity.

### h.      Alabama Case Law Supports Removal Jurisdiction.

In breast implant litigation involving similar facts and claims, Wyeth argues, the court concluded that plaintiffs' claims against Alabama medical providers constituted fraudulent joinder and denied plaintiffs' claims for remand. *See In re: Silicone Gel Breast Implants Products Liability Litigation* (MDL-926), Order No. 43 (entered March 10, 1998) (Master File No. CV-92-P-10000-S). *See* Def. Apdx. V. In that case, as here, Wyeth contends, the products liability defendants removed

---

[32] Wyeth's take on this publicity has been discussed earlier in this memorandum opinion.

34

cases to federal court based on fraudulent joinder of Alabama hospitals and argued that plaintiffs' claims against the hospitals were time-barred by § 6-5-482. Plaintiffs moved to remand, Wyeth asserts, raising similar arguments to th00ose raised by plaintiffs in this case. In dismissing plaintiffs' arguments, the court first found it important that plaintiffs alleged (as plaintiffs do in this case) that "at all times silicone breast implants were unreasonably dangerous and had a propensity to cause both local injuries and a variety of systemic diseases...." Order No. 43 at p. 1 (Appendix V). Notably, Wyeth urges, the court determined as a matter of law that the plaintiffs' injuries must have occurred "at, or not long after" the implantations, finding:

> In deciding whether to disregard the citizenship of the hospital defendants under the fraudulent joinder doctrine, this court is not wholly confined to the bare bones of the complaints. ... Moreover, each of the complaints ... contains allegations such as "the breast implants were in a defective condition and were unreasonably dangerous for use as breast prostheses in the human body at the time of implantation and at all time thereafter"....

> This court concludes that, in the light of such allegations and without even considering other evidence illuminating when the plaintiffs have claimed their injuries first occurred, it is clear that the causes of action asserted by them against the hospital defendants accrued at, or not long after, the implantations and were not the subject of any lawsuits until long after the time periods in §6-5-482 had expired. Accordingly, the citizenship of such defendants should be disregarded, and the plaintiffs' motions to remand are hereby denied.

Id. at 6 (emphasis added). *See* Def. Apdx. V.

The *Harvell* plaintiffs' claims, Wyeth contend, are analogous to that opinion. Here, plaintiffs claim that Pondimin and Redux were unreasonably dangerous at all times that they were on the market and that Dr. Belyeu improperly prescribed diet medications to them. Additionally, Wyeth alleges, plaintiffs' complaint was filed more than six years after Dr. Belyeu could have last prescribed Pondimin and/or Redux for plaintiffs. Wyeth argues: "As a result, this lawsuit would be timely filed

only if plaintiffs suffered no injury for several years after they were last exposed to the diet medications. Such a factual sequence not only is implausible, it is nonsensical. ... Accordingly, this Honorable Court should also rule as a matter of law that if plaintiffs were injured, they suffered this injury by the time of their last exposure to the diet medications, and that, as such, their claims are time-barred."

Wyeth further relies on *Ramey v. Guyton*, 394 So. 2d 2 (Ala. 1980), in which the defendant doctor allegedly committed malpractice in prescribing birth control pills for plaintiff on August 27, 1975. Plaintiff took these pills daily until nearly a year later, August 5, 1976, when she suffered a stroke. Plaintiff sued the doctor in August 1978, within two years of her stroke, but nearly three years after the doctor gave her the birth control prescription. In *Ramey*, Wyeth notes, the trial court dismissed the lawsuit as untimely, but the supreme court reversed, finding that plaintiff's cause of action arose when her injury, the stroke, occurred. The fact that the accrual date did not coincide with the negligent act - the prescribing of the drugs - does not alter the analysis. 394 So.2d at 4. Justice Shores, concurring, stated:

> Injuries of the Raytheon type (asbestos exposure) could occur only when the patient was exposed to the drug and, under that opinion, the date of the injury was measured from the last exposure. Here the date of injury must be measured from the date the last pill was taken, which was within four years [which was then the requisite time period] of the date suit was filed.

Id. at 6.

The majority of justices in *Ramey*, Wyeth argues, could pinpoint plaintiff's stroke as the onset of her injury because plaintiff was taking the medicine up until the time of her stroke with no gap in her exposure.

In order for Harvell's and Scarbrough's claims to comply with Ala. Code § 6-5-482,

36

however, Wyeth asserts that plaintiffs' heart valve damage would have had to have occurred, for the first time, several years after they ceased their use of Pondimin and/or Redux. According to Wyeth, such a scenario "defies common sense." Under Justice Shore's analysis in *Ramey*, Wyeth argues, plaintiffs' injuries must have commenced when they consumed their last diet pill -- well over six years before this lawsuit.[33]

Finally, Wyeth requests that plaintiffs' request for Rule 11 sanctions should be denied. Wyeth argues that the cases relied upon by plaintiffs involved fraudulent joinder of sales representatives, not fraudulent joinder of physicians. As demonstrated above, Wyeth contends, Dr. Belyeu was fraudulently joined, providing this court with diversity jurisdiction. Even should the court were to disagree as to the fraudulent joinder issue, Wyeth asserts, it had ample grounds for removal, including the *Rainey, Ferrell, Wilson,* and *Smith* decisions, *see supra*, in which the MDL court found that plaintiffs' claims against the prescribing doctors were time barred under Alabama law.

### III.    Plaintiffs' Reply

First, plaintiffs repeat arguments and case law in favor of judicially-imposed sanctions against Wyeth, contending that the present removal is improper and frivolous and part of a "pattern of abuse." Furthermore, plaintiffs argue, their choice of venue "trumps" Wyeth's right of removal, quoting *Burns v. Windsor Insurance Company*, 31 F.3d 1092, 1095 (11th Cir. 1994)("While a defendant does have a right, given by statute, to remove in certain situations, plaintiff is still master of his own claim. [citations omitted]. Defendant's right to remove and plaintiff's right to choose his forum are not on equal footing; ...removal statutes are construed narrowly;...uncertainties are

---

[33] The court notes that the *Shores* analysis was in a special concurrence.

resolved in favor of remand.")

Next, plaintiffs asserts, Wyeth has wholly failed to meet the elevated burden of proving fraudulent joinder. Plaintiffs again list thirty-eight cases ordered remanded despite fraudulent joinder allegations by Wyeth.[34] The moving party, plaintiffs remind the court, must show that plaintiffs have "no possibility" of stating a valid cause of action against the non-diverse defendant. Here, plaintiffs argue, viable, colorable claims exist against Dr. Belyeu. *See, e.g., Wright v. Amer. Gen. Life and Accident Ins. Co.*, 136 F. Supp. 2d 1207 (M.D. Ala. 2001).

Turning to their claims against Dr. Belyeu, plaintiffs argue, such claims are timely by way of the discovery rule and the requirement of legal injury. Contrary to Wyeth's contentions, plaintiffs contend that they have alleged conduct by Dr. Belyeu which occurred long after the removal of the diet drugs from the market in September 1997. Such conduct, plaintiffs argue, amounted to negligence and/or fraud/fraudulent concealment and thus such claims are not time-barred because

---

[34] Plaintiffs quote *Crowe v. Coleman* as follows:

> Over and over again, we stress "the trial court must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits." *Id.* at 548-49. When considering a motion for remand, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law. *See Id.* "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440-41 (11th Cir. 1983) ....

> This consequence makes sense given the law that "absent fraudulent joinder, plaintiff has the right to select the forum, to elect whether to sue joint tortfeasors and to prosecute his own suit in his own way to a final determination." *Parks v. New York Times Co.*, 308 F.2d 474, 478 (5th Cir. 1962). The strict construction of removal statutes also prevents "exposing the plaintiff to the possibility that he will win a final judgment in federal court, only to have it determined that the court lacked jurisdiction on removal," *see Cowart Iron Works, Inc. v. Phillips Constr. Co., Inc.*, 507 F. Supp. 740, 744 (S.D. Ga. 1981) ..., a result that is costly not just for the plaintiff, but for all the parties and for society when the case mut be re-litigated.

"[p]laintiffs did not discover and did not have means to discover the harm they suffered as a result of their ingestion of [Pondimin and/or Redux] until each underwent echocardiogram and/or other medical testing diagnosing them with heart and/or pulmonary problems." Again, plaintiffs quote *Adams v. American Home Products. See supra.* Under Alabama law, plaintiffs remind the court, plaintiff may recover in tort only when she has manifested a present, legal injury. Relying upon *McCormick v. Aderholt*, plaintiffs argue, when the wrongful act or failure to act and the legal injury did not occur simultaneously, the cause of action accrues and the limitations period commences when the legal injury occurs. Plaintiffs then argue: "Wyeth erroneously asserts that, under Alabama law, if one thinks they may be hurt they have a legal right to bring a cause of action. This position is wholly illogical as it cannot be disputed that one must sustain legal injury before one has a legal right to make a valid claim under Alabama law."

According to plaintiffs, their claims for fraud and/or fraudulent concealment against Dr. Belyeu are timely. Plaintiffs note that Alabama law imposes a duty between persons who enjoy a confidential relationship to safeguard the interests of the other and that withholding material facts materially breaches that duty and constitutes actionable fraud. *See* Ala. Code section 6-5-102; *Johnson v. McMurray*, 461 So. 2d 775, 778 (Ala. 1984). Plaintiffs highlight the complaint's paragraphs 84-103 as constituting viable allegations against Dr. Belyeu regarding fraud/fraudulent concealment.[35]

According to plaintiffs, Dr. Belyeu indisputably prescribed the "diet-drugs" to plaintiffs, among others. Plaintiffs deem Dr .Belyeu "undoubtedly aware" of the removal of Pondimin and

---

[35] The court has considered this portion of the complaint in its entirety but does not repeat these allegations here.

Redux from the market and of the volumes of literature indicating that these drugs cause valvular

heart disease and pulmonary system damage.  Despite these realizations, plaintiffs argue, Dr. Belyeu

has never advised either of the plaintiffs to seek medical examination or treatment for these potential

injuries or made an effort to inform plaintiffs of the risks to their health.  Additionally, plaintiffs

contend, some of the conduct constituting negligence here – failing to inform plaintiffs of the need

for action and testing – continued such that such conduct occurred within the statutory limitation

and/or repose periods imposed by the AMLA.  As Harvell's and Scarbrough's claims aren't time-

barred, plaintiffs assert, the fraudulent joinder argument lacks merit.

Furthermore, plaintiffs assert, the issue of timeliness, i.e., when the AMLA cause of action

accrued, is a question of fact for the jury.  Again, plaintiffs rely on *Barton v. American Red Cross*,

*see supra*.[36]  The scenario from *Herring* cited in *Barton*, plaintiffs argue, is analogous to the case at

bar.

According to plaintiffs, Wyeth's "latency" argument suffers two defects: (1) it is not a

---

[36] Plaintiffs quote *Barton* as follows:

In *Herring*, the plaintiff was examined by the defendant, Dr. Shirah, for problems
relating to a lump in her breast and was told that the lump was nothing to worry about.
Almost a year later, plaintiff went to a different doctor, Dr. Naik, who told her after
an examination that he suspected that the lump was cancerous.  Five months later,
Dr. Naik performed a modified mastectomy and the results showed that the lump was
cancerous.  Plaintiff did not file her malpractice action against Dr. Shirah until almost
six months after the mastectomy.

Plaintiff argued that she did not learn of sufficient facts that would reasonably
have led to the discovery of her cause of action until after the mastectomy.  She
contended that "she could not be sure that she had a claim until after the surgery
and tests were performed and that the lump was confirmed to be cancerous." ...
Dr. Shirah argued that plaintiff had sufficient facts that would lead to the discovery
of her cause of action at the point at which Dr. Naik examined her and told her
the lump might be cancerous.  The Alabama Supreme Court held that there was a
genuine issue of material fact as to when plaintiff discovered facts to give rise to her
claim.

40

relevant consideration under the discovery rule; and (2) Wyeth has relied on an improper factual source.

Regarding (1), plaintiffs assert, the only valid inquiry under the Alabama discovery rule is when plaintiffs first suffered legal injury. The issue, plaintiffs argue, is not whether the condition is latent but whether the condition should or could have been found with "reasonable diligence" prior to undergoing an echocardiogram. Again, plaintiffs insist, this accrual and discovery issue is a question of fact for the jury. Given plaintiffs' reliance on Dr. Belyeu's medical advice, plaintiffs argue, Wyeth's claim that they should have discovered their injuries by September 1997 or no later than March 1999 had they gone to a doctor for appropriate testing merely raises an issue of fact. Plaintiffs allege that they consulted with a cardiologist when they first learned that they may have been injuried and at that time had an echocardiogram. According to plaintiffs, it was only after they learned the results from that test that their causes of action accrued under Alabama law. Here, plaintiffs contend, Wyeth has not shown that the plaintiffs failed to visit their physicians in a timely manner or that such a visit would have resulted in an echocardiogram that necessarily would have revealed FDA-positive VHD.

In support of (2), plaintiffs contend that Wyeth improperly tries to use the latency-related findings of the MDL court Pretrial Order 1415 – an order drafted for the sole purpose of certifying and approving the nationwide settlement of the class action diet drug litigation. According to plaintiffs, Wyeth's reliance upon these factual findings regarding latency directly violates the Nationwide Class Action Settlement Agreement itself, which reads:

> The Parties to the Settlement ... shall not seek to introduce and/or to offer the
> terms of the Settlement Agreement, any statement, transaction or proceeding

> in connection with the negotiation, execution or implementation of this Settlement Agreement, any statements in the notice of documents appended to this Settlement Agreement, <u>stipulations, agreements, or admissions made or entered into in connection with the fairness hearing or any finding of fact or conclusion of law made by the Trial Court, or otherwise rely on the terms of this Settlement, in any judicial proceeding, except insofar as it is necessary to enforce the terms of the Settlement.</u>

*See* 2004 WL 1152824, *13 & n. 9 (3rd Cir. 2004)(Emphasis added). Plaintiffs further note that the Third Circuit held that the language of the settlement agreement must "be strictly construed against those who seek to restrict class members from pursuing individual claims," *id*. at 12-13, and that "neither party can offer evidence regarding the settlement agreement, including evidence regarding its negotiation or <u>implementation</u>." *Id.* at 14.(Emphasis added). According to plaintiffs, Wyeth is not referring to the MDL court's latency findings "to enforce the terms of the Settlement" but rather is improperly attempting to prevent plaintiffs from exercising their opt-out rights. Thus, plaintiffs assert, such latency findings are inadmissible.

Finally, plaintiffs repeat, publicity of <u>potential</u> harm does not trigger the statute of limitations. According to plaintiffs, Wyeth's supporting cases are inapposite because in each of them, either the publicity disclosed the actual harm or the plaintiff was aware of any injury when publicity disclosed the cause of injury. *See, e.g., United Klans of Am. v. McGovern*, 621 F.2d 152 (5th Cir. 1980).[37]

---

[37] The court provides a relevant excerpt from *United Klans*:

> On November 18, 1974, then Attorney General William Saxbe held a press conference at which he revealed the existence of the COINTELPRO program to the public. At the conference, Saxbe distributed a Department of Justice press release which indicated that "White Hate" groups were a target of the COINTELPRO program. The release summarized the techniques used by COINTELPRO against White Hate groups, techniques which the Department of Justice conceded, in some instances, to be "abhorrent in a free society." In oral remarks at the conference, Saxbe spoke specifically about FBI counterintelligence activities against the Klan. He said that some of these activities may have been improper.

> The Attorney General's press conference was attended by the three major networks, the wire services, and many of the leading newspapers in the country. On the following day, November

Under the Alabama discovery rule, plaintiffs argue, mere notice of possibility of injury is not sufficient for a cause of action to accrue; instead, plaintiff must have reasonable notice of both the injury and the cause of injury. Plaintiffs contend: "Even assuming, arguendo, that the present Plaintiffs became aware that they had unwittingly used a potentially dangerous drug as alleged by moving Defendant, this awareness did not put them on notice that they had an actionable claim until they had actual evidence of appreciable harm. This is far from the clear and convincing evidence ...Wyeth must put forth to survive Plaintiffs' Motion to Remand."

**MOTION TO STAY**

**I.    Wyeth's Motion**

Wyeth first notes that numerous Fen-Phen cases have been transferred to the MDL-1203 proceeding in the Eastern District of Pennsylvania and that certain judges in Northern District of Alabama have remanded similar cases. Wyeth argues that these remand decisions reflect a misunderstanding of the JPML letter which encouraged transferor judges to rule on pending remand motions "unless you conclude that the motion raises issues likely to arise in other actions in the transferee court, should we order transfer, and would best be decided there." Wyeth then lists numerous cases in which Alabama federal courts have stayed diet drug cases removed to them, with pending motions for remand, for transfer to the MDL for resolution.[38]

---

19, 1974, articles reporting the substance of the press conference appeared in at least two newspapers with a circulation in the Northern District of Alabama, Western Division, where this suit was filed. One of these articles expressly named the KKK as a COINTELPRO target. Where events receive such widespread publicity, plaintiffs may be charged with knowledge of their occurrence. See *In re Beef Industry Antitrust Litigation*, 600 F.2d at 1169-71; *Smith v. Nixon*, 606 F.2d 1183, 1190 n. 42 (D.C.Cir.1979), petition for cert. filed, 48 U.S.L.W. 3404 (Dec. 7, 1979) (No. 79-882).

[38] The court has considered but does not repeat all of those citations here.

According to Wyeth, this case presents significant jurisdictional issues that have arisen and will continue to arise in numerous federal courts across the country.[39]  Wyeth asserts the MDL court's unique familiarity with the underlying facts and patterns of fraudulent joinder in diet drug litigation.  Allowing the MDL court to consider these issues, Wyeth argues, will save judicial time and ensure consistent rulings.  By Wyeth's account, transfer is particularly appropriate here "as plaintiffs allege that Wyeth removes cases for purposes of delay, and Wyeth alleges that plaintiffs have engaged in a pattern of suing innocent persons, such as the doctor here, to prevent removal. The MDL has the broader perspective of over six years of diet drug litigation arising in cases filed all over the United States in which to evaluate these allegations."[40]  Wyeth quotes the *Betty Hagler v. Wyeth* opinion:

> There is similarity in issues involved in remand motions in these cases
> nationwide, i.e., whether sales representatives and other individual resident
> defendants have been fraudulently joined to avoid federal jurisdiction.  This
> court recognizes its authority to consider and rule on a Motion to Remand
> at any time before a final transfer, but finds it to be more appropriate to
> await a determination by the MDL Panel in regard to transfer.  A transfer
> to the MDL Court does not result in a denial of a motion to remand; it
> simply leaves the motion for determination by the MDL Judge.  Because
> of the similarity of these issues nationally and in the interests of uniformity
> and judicial economy, this court finds that the remand motion is best left
> for consideration and determination by the judge who is considering the
> same issues on a nationwide basis, in the event the case is ordered transferred.

According to Wyeth, this court has jurisdiction to transfer this case to the MDL despite the pendency of plaintiffs' motion to remand.  *See, e.g, Gould v. Nat'l Life Ins. Co.*, 990 F. Supp. 1354,

---

[39] While Wyeth frames that issue as the fraudulent joinder of Wyeth sales representatives, this case instead involves the fraudulent joinder of plaintiffs' alleged prescribing physician, Dr. Belyeu.

[40] Again, this court notes, the fraudulent joinder of sales representatives was not mentioned in the parties' remand briefs and does not appear to be the issue at hand.

1362-63 (M.D. Ala. 1998).  Wyeth also relies on *In re Ivy*, 901 F.2d 7 (2d Cir. 1990), *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 368 F. Supp. 812, 813 (J.P.M.L. Dec. 14, 1973), etc.

## II.    Plaintiffs' Response

First, plaintiffs argue, the Eleventh Circuit has held that before ruling on a motion to stay, the district court should address any challenge to the subject matter jurisdiction. *See Univ. of South Ala. v. Amer. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999)("a court should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings").  This requirement, plaintiffs argue, applies when a court lacks subject matter jurisdiction *ab initio* and is without any power to take any action, including the issuance of the instant stay.  Plaintiffs repeat that their motion to remand specifically challenges the subject matter jurisdiction of this court, saying that no diversity exists.[41]

Moreover, plaintiffs contend, both the JPMDL and MDL-1203 have encouraged this court to rule on plaintiffs' motion to remand.  Plaintiffs cite the February 20, 2004 letter from the JPMDL to all "involved judges."[42]  Plaintiffs then quote extensively from Judge Bartle's remarks in the July 16, 2002 hearing transcript regarding the "fraudulent joinder" issue.[43]  Based on the foregoing, plaintiffs contend, this court is clearly in the best position to decide jurisdictional issues premised upon Alabama and Eleventh Circuit law.

Furthermore, plaintiffs emphasize, the federal district courts in Alabama are heeding the

---

[41] *Supra* note 45.

[42] This court observes that defendant Wyeth has provided pertinent text from that letter *supra*.

[43] *See supra* note 34.

45

encouragement of the JPMDL and Judge Bartle by lifting stays and ruling on remand motions.

Plaintiffs again list cases where judges have remanded diet drug litigation to state court, including

*Cross v. Wyeth*, CV-03-0882-BH-M (March 29, 2004). Finally, plaintiffs argue, inconsistent results

will not occur if this court applies the law of Alabama and the Eleventh Circuit. Plaintiffs urge this

court to consider the fact that issuance of a conditional transfer order is "uncertain and speculative

at best," meaning that a stay will subject plaintiffs to undue delay in the prosecution of their cases.

**III.    Wyeth's Reply**[44]

Plaintiffs jurisdictional argument, Wyeth argues, is wrong, again citing *In re Ivy*, *In re Air

Crash Disaster*, etc. Furthermore, Wyeth asserts, plaintiffs have mischaracterized the JPML's

February 20, 2004 letter. Wyeth again cites pertinent language from that letter as well as Judge

Albritton's statement in *Hagler*, *see supra*. Furthermore, Wyeth contends, Judge Bartle welcomes

transfer. Wyeth accuses plaintiffs of selectively quoting the July 2002 hearing, providing another

quote: "I mean, maybe it makes a lot of sense for the MDL Court to take a first crack at [a fraudulent

joinder inquiry under state law], just to see what it is, or at least to pass upon it and decide whether

it should go back to the federal court in a particular state." Moreover, Wyeth notes, Judge Bartle

ended up denying plaintiffs' motion to remand in PTO 2567.

Finally, Wyeth argues, this case is different, as the claims against plaintiffs' alleged

prescribing physician, Dr. Belyeu, are barred by both the AMLA's two-year limitations period and

the four-year statute of repose. Wyeth repeats its earlier arguments regarding the lack of latency of

Pondimin and Redux injury. *See, e.g., Rainey v. Wyeth*. Again, Wyeth argues, Judge Bechtle

---

[44] To the extent that defendant Wyeth asserts arguments that have already been summarized in *Braden v. Wyeth*, this court will not repeat such arguments.

decided that any injury from Pondimin and Redux is sustained while using the medication or shortly thereafter, not years later.  In light of these judicial determinations and scientific/medical evidence on the issue, Wyeth contends: "[P]laintiffs suffered injury, if at all, in 1997, and necessarily had to file their claims against Dr. Belyeu by the end of 1999 to prevent their claims against Dr. Belyeu from being time-barred."

As for the AMLA's "discovery rule," Wyeth argues, it provides no safe harbor for plaintiffs in light of their Intermediate Opt-Out forms dated April 2003.  Those forms, Wyeth asserts, indicate that plaintiffs were represented by legal counsel and certified their entitlement to exercise those rights by meeting certain medical criteria.  Wyeth points out that plaintiffs did not file their lawsuit until almost a year later.  Moreover, Wyeth contends, even if they could somehow bring their claims within this six-month tolling period, the claims would still be barred by the AMLA's four-year statute of repose which applies regardless of when claims were discovered.

## CONCLUSIONS OF THE COURT

This judge has written so much on these issues that there is no need to further elaborate. The only thing that these cases prove is that "officers of the court" often disagree.  One is reminded of the Senate Judiciary Committee.  This case is somewhat different from other cases in that there is not as much argument as to the underlying responsibility of the non-diverse defendant as there is as to the availability of a defense or a ground for a motion to dismiss because of a statute of limitations.

This whole area is rife with senseless law.  This includes:

(1) The fact that a "possible" (without further definition) claim can defeat diversity jurisdiction.

47

(2) The fact that a grant of summary judgment as to a non-diverse defendant will not allow removal thereafter.

(3) The allowance of the tail wagging the dog when everyone knows who the target defendant is.

(4) The room which is afforded for subjective rulings.

(5) The room which is afforded for constant stretching of the law accompanied with accusations and recriminations lacking in good faith but awash in sanctimony.

(6) The purpose of MDL is undermined by the constant attempts to avoid jurisdiction resulting in MDL proceedings.

(7) The room which is afforded for constant game playing.

(8) The fact that remand orders are generally non-appealable.

(9) Etc.

This court ultimately concludes that:

(1) There is no controlling law on the issue of when the alleged injuries occurred.

(2) There may be a "possibility" of physician liability resulting from a failure to contact the plaintiffs after knowledge of the removal of the drugs from the market.

(3) In general, *Compare Gilmore v. M & B Realty Co.,LLC*, 2004 W.L. 1475424 (Ala. 2004).

The court will grant the plaintiffs' Motion to Remand.  It will do so with no great assurance of the correctness of that ruling.  The Motion for Sanctions will be denied.  The court's rulings are in no way rulings on the merits.

This the ____ day of July, 2004.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE